BOARD OF COUNTY COMMISSIONERS OF GRAND COUNTY *v.* BOARD OF COUNTY COMMISSIONERS OF LARIMER COUNTY.

Monuments control courses, and a specific course will control a general course. The legislature, in defining a boundary line, having given a starting point upon the Continental divide, and thence to proceed "northerly on said summit," *held*, that by the words "thence in a northerly direction on said summit" the legislature intended a continuous line, following the course of the summit of the range upon which they had established a starting point, and that it was a call for a specific course.

*Error to District Court of Summit County.*

BILL for injunction. Judgment for defendants. Writ of error to the supreme court.

*    *    *    *    *    *    *    *    *    *    *

"An act to define county boundaries, and to locate county seats, in Colorado territory:

"*Be it enacted by the council and house of representatives of Colorado territory:*

"Sec. 1. That the following shall be the boundaries of the respective counties, and the county seats therein, as named, with the description thereof:

"Sec. 2.   Costilla county: Commencing at a point on the southern boundary of the territory where the range line between ranges sixty-nine (69) and seventy (70) intersects said boundary; thence north, along said range line, to the point where said line intersects the Sangre de Christo pass or road; thence, in a southwesterly direction, on said road, to the summit of the Snowy range; thence, in a northwesterly direction, on said summit, to the range dividing the waters of the Eagle Tail river and the Rio Grande del Norte; thence, in a southwesterly direction, with said range, to a point opposite the headwaters of the Rio Grande del Norte; thence, in a westerly direction, along the Sierra de la Plata, to the western boundary of the territory; thence south, to the southwest corner of the territory; thence east, to the place of beginning."

\*  ·  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

"Sec. 10.   Fremont county: Commencing where the line between ranges sixty-eight (68) and sixty-nine (69) intersect the third correction line south; thence due west on said correction line to where said line, if continued, would intersect the Arkansas river; thence due south, to the summit of the Snowy range; thence along said range, to the Sangre de Christo pass; thence along said road or pass, to where said road intersects the line between ranges sixty-nine (69) and seventy (70); thence north, to a point where said range line intersects township line between townships twenty-two (22) and twenty-three (23) south; thence east three (3) miles to the center of range sixty-nine; thence north, to a point where said line intersects the township line between townships seventeen (17) and eighteen (18) south; thence east three (3) miles, on said line, to where said line intersects the line between ranges sixty-eight (68) and sixty-nine (69); thence north twelve (12) miles, to the place of beginning."

\*  \*  \*  \*  \*  \*  \*  ·  \*  \*  \*  \*

"Sec. 20. Larimer county: Commencing at a point where the township line between townships four (4) and five (5) north intersect the range line between ranges sixty-seven (67) and sixty-eight (68), running west six miles; thence south six miles, to the township line between townships three (3) and four (4) north; thence west along the northern boundary of Boulder county, to the summit of the Snowy range; thence in a northerly direction, on said summit, to the northern boundary of the territory; thence east on said northern boundary to the range line between ranges sixty-seven (67) and sixty-eight (68); thence south to the place of beginning."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Sec. 22. Boulder county: Commencing at a point where the township line between townships one (1) and two (2) south intersect the range line between ranges sixty-eight (68) and sixty-nine (69); thence west on said township line to the east line of Gilpin county; thence along said line to the South Boulder creek; thence west along the northern boundary of Gilpin county, to the summit of the Snowy range; thence along the summit of first range, to a point at or near the summit of Long's peak; thence east on said township line, to the range line between ranges sixty-eight (68) and sixty-nine (69); thence south to the place of beginning."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Sec. 26. Clear Creek county: Commencing at the junction of the North and South Clear creeks; thence up the dividing ridge between said streams, to the summit of the Snowy range; thence along said summit, to the point where the correction line south, if continued, would intersect said summit; thence east on said correction line, to the western boundary of the county of Jefferson; thence north to the place of beginning."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Sec. 28. Gilpin county: Commencing at the junction of the North and South Clear creeks; thence north,

to the South Boulder creek; thence up the channel of said creek, to a point where Beaver creek unites with Boulder creek; thence in a line due west, to the summit of the Snowy range; thence south on said summit, to the northern boundary of Clear Creek county; thence, in an easterly direction, with said northern boundary, to the place of beginning."

\* \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Sec. 30.  Park county: Commencing at a point where the second correction line south intersects the Platte river; thence south, to the third correction line south; thence west, to the summit of the Snowy range, east of the Arkansas river; thence in a northerly direction, along the divide between the Arkansas and Platte rivers, and around the head-waters of the Platte river, and its branches; thence easterly, along the Snowy range, dividing the waters of the Platte from the waters of the Blue, to the point of intersection with the first correction line south; thence east on said correction line, to the western boundary of Jefferson county; thence south on said boundary, to the Platte river; thence up the center of said river, to the place of beginning."

\* \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"Sec. 32.  Lake county: Commencing at a point on the summit of the Snowy range, at the northwest corner of the county of Park, and running due west, to the western boundary of the territory; thence south on said boundary, to the summit of the Sierra la Plata, or the northwest corner of Guadaloupe county; thence easterly along the northern boundary of said county, to the northwest corner of Costilla county; thence northerly along the summit of the Snowy range, or boundary of San Miguel de la Costilla county, to the northwest corner of the county of Fremont; thence north, on the western boundary of said county, to the northwest corner of said county; thence east, on the northern boundary of said county, to the summit of the range dividing the

waters of the Platte and Arkansas rivers; thence northerly on said summit, to the place of beginning."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Sec. 34.    Summit county: All that portion of the territory bounded on the south by the county of Lake, and on the east by the summit of the Snowy range, and on the north and west by the territorial boundary."

Messrs. W. T. HUGHES and HUGH BUTLER, for plaintiffs in error.

Messrs. HAYNES, DUNNING and ANNIS and BALLARD and ROBINSON, for defendants in error.

ELBERT, J.    The great range known as the "Sierra Madre" or "Continental Divide," to which frequent reference must be made in this case, traverses the state from south to north.    While its trend is irregular, sweeping far to the west, and then to the east, of a direct northerly line, it both enters and leaves the state substantially at the one hundred and seventh meridian.    It constitutes the water-shed between the waters of the Pacific and the waters of the Atlantic flowing into the Gulf.    Southward it throws off several spur ranges to the southeast, which mask it from the plains.    Northward for a long distance it is the great range fronting the plains.    Near the northern extremity of this front stands Long's peak, rising to an altitude of fourteen thousand two hundred and seventy-one feet, and overlooking the northern boundary of the state, at a distance of from fifty to sixty miles.    From this peak, for a distance of about eighteen miles (according to the Hayden surveys and maps), this great chain trends in a northwesterly direction to Richthofen peak, where it bifurcates, throwing off a spur to the north and northwest, known as the "Medicine Bow Range."    The main range turns westward for a distance of forty or forty-five miles, when it again resumes and maintains its general northerly direction to the northern

boundary of the state.    Within the embrace of these two
ranges lies what is known as the North Park, walled in by
the Medicine Bow range upon the east, by the main range
upon the south and west, and by a series of secondary
mountains and hills upon the north.    It is elliptical in
form and a principality in extent, rich in soil, luxuriant
in pasturage, and supreme in the grace and beauty of its
valleys and the grandeur of its mountain architecture.
It holds within its ample compass the abounding springs
which feed the head-waters of the North Platte, which
here has its rise, and which, gathering together its mount-
ain affluents, forces a passage through the northern rim
of the park, on its way to the Gulf.    It is contended by
the plaintiffs that this park lies within the boundaries of
the county of Grand; by the defendants, within the
boundaries of the county of Larimer.

The county of Grand was formed from a portion of the
territory of the county of Summit, which, with Larimer
and fifteen other counties, constituted the seventeen coun-
ties into which the territory was originally divided by the
first territorial legislature.    This division was made by an
act approved November 1, 1861, entitled "An act to de-
fine county boundaries and to locate county seats in
Colorado territory."    The question is whether, by the
terms of this act, the North Park is within the boundaries
of the county of Larimer or within the original bound-
aries of the county of Summit.    If the latter, it follows
that it is now within the boundaries of the county of
Grand.

By reference to the act, it will be noticed that the sec-
tion establishing the boundaries of Larimer county fixes
the southwestern corner on the summit of the Snowy
range.    The language is: "Thence west, along the north-
ern boundary of Boulder county, to the summit of the
Snowy range."    This is also the northwestern corner of
Boulder county, "at or near the summit of Long's peak,"
as will be seen by reference to section 22 of the act.    The

sentence describing the western boundary of Larimer county is as follows: "Thence [from Long's peak], in a northerly direction, on said summit, to the northern boundary of the territory."

The plaintiffs contend that this fixes the Medicine Bow range, before described, as the western boundary of Larimer county; that, although a spur, it has all the characteristics of a snowy range, and it is the only range northerly. On the other hand, it is contended by the defendants that, in using the term "snowy range," the legislature intended the Great range or Continental divide, and that, although it has, for quite a distance, as we have seen, a course due westward, it is the monument indicated and must control the course.

The legislative intention in the use of the term "snowy range," in defining the boundaries of the county of Larimer, is the leading question, and to it the argument of counsel, and the testimony of witnesses, are largely addressed. The same term, employed in the section describing the boundaries of the county of Summit, is also to be interpreted, as the eastern and western boundaries of these two counties are supposed to coincide, and the term "snowy range" in both sections to refer to the same boundary line. The argument proceeds upon this hypothesis.

The witnesses are all, or nearly all, early settlers, acquainted with the early history of the country, and many of them prominently identified with it. Their testimony is conflicting. By some it is said that the term "snowy range" was applied to any snow-carrying range, with peaks elevated above the snow-line; by others, that it was a term exclusively applied to the range dividing the Atlantic and Pacific waters. We think the preponderance of testimony supports the latter view. It will be seen, however, by reference to the act of the legislature, that the term is applied not only to the Continental divide, but to the great mountain spurs known as the

Mosquito and Sangre de Christo ranges. If we lay aside the conflicting testimony upon this point, and address ourselves to a consideration of the act itself,— to a comparison of the different sections in which the disputed term occurs,— we think there is sufficient to be found to determine this controversy with reasonable certainty and by established rules.

The term occurs in nine different sections. In the sections establishing the counties of Costilla and Fremont, the term "snowy range" is applied to the Sangre de Christo spur, but the range meant is clearly indicated by the use of the words "Sangre de Christo" in each case. In the section establishing the county of Park, the term is applied to the Mosquito spur, but it is designated as "the snowy range east of the Arkansas river." In section 32, defining the boundary of Lake county, the term "snowy range" is applied, without further description, to the Continental divide. The Mosquito range, to which the term "snowy range" is applied in section 30, is described in this section as "the range dividing the waters of the Platte and Arkansas rivers." A noticeable fact is that to the extent that the great western spur (the Sierra la Plata range) is made the southern boundary of this county, it is described by its local name, and that as soon as the Continental divide is reached, the term "snowy range" is again employed as a descriptive term. In the sections fixing the boundaries of Boulder, Clear Creek and Gilpin, the western boundaries are fixed "on the summit of the Snowy range," and here the Continental divide is meant, without dispute. The Continental divide constitutes, in part, the western boundary of the county of Park, at the north, where it is described as "the Snowy range, dividing the waters of the Platte from the waters of the Blue."

The legislature having divided substantially all the territory east of the Continental divide into fifteen counties, addressed themselves to a division of the broad

domain lying west of it, but little known, and with but few settlements. They divided it (excepting a small portion already embraced within the boundaries of the county of Guadaloupe) (Conejos) into the two great counties of Lake and Summit, the former upon the south, the latter upon the north. They are the last two counties established by the act, and in the order named. We have already seen that where the eastern boundary of the county of Lake rests upon the summit of the Continental divide it is designated by the term "snowy range," without more; that where it rests upon the summit of the Mosquito spur, it is designated as "the range dividing the waters of the Platte and Arkansas rivers;" and it is to be further noted that its eastern boundary is made to conform to the western boundaries of Costilla, Fremont and Park, already established and confronting it on the east.

We have thus noticed seven out of the nine sections of the act in which the term "snowy range" occurs. The other two sections in which it occurs are the sections concerning the counties of Larimer and Summit, which we are called upon to construe. If we summarize the result of this examination, we find (1) that in every instance (Boulder, Gilpin, Clear Creek, and Lake) save one (Park), where the term "snowy range" is applied to the Continental divide, it is used singly and in itself as being descriptive of what was intended; (2) that in every instance (Costilla, Fremont and Park), where the term is applied to a spur, the spur meant is in some other way indicated; (3) that in every instance (Costilla, Lake and Park), where the boundary passes from one range to another, the fact is clearly stated; (4) that in the only instance (Lake) of a county lying west of the Continental divide, its eastern boundary is made to conform to the western boundaries of the counties already established on the east of the divide, and that this eastern boundary rests in part upon the Continental divide, and in part

upon the Mosquito spur, and *that that fact is clearly stated.*

Construing sections 20 and 34, establishing the boundaries of the counties of Larimer and Summit, *in pari materia*, and arriving at the intention of the legislature in using the term "snowy range" in these two sections by the manner of its use in the other seven sections, we must say: (1) That had they intended a spur, as in whole or in part constituting a boundary, they would have indicated the spur meant. Such is the rule, without exception, in the other sections. (2) That had they intended that the boundary in its course should leave the summit of one range, and pass to another, they would have so directed in plain terms; for such is also the rule, without exception, in the other sections. (3) If they had already fixed the western boundary of the county of Larimer in part upon the Continental divide, and in part upon the Medicine Bow range, that in fixing the eastern boundary of the county of Summit so as to conform to it they would have clearly indicated, as in the case of the county of Lake, that it rested in part upon the Continental divide and in part upon a spur.

In this connection it must be remembered that the evidence shows that prior to the first session of the territorial legislature the Medicine Bow range was known by that name and as a "spur."

Construction *in pari materia* leads, thus, to but one conclusion, namely, that the legislature, by the term "snowy range," both in the section establishing the boundaries of the county of Larimer and the section establishing the boundaries of the county of Summit, intended to indicate and establish the Continental divide as the eastern boundary of the one and the western boundary of the other. If we construe the two sections independently, we are led to the same conclusion. Section 34 of the act describes Summit county as being "all that portion of the territory bounded on the south by the

county of Lake, *on the east by the summit of the Snowy range*, and on the north and west by the territorial boundary." This eastern boundary, on a straight line from north to south, has a length, in round numbers, of about one hundred and ten miles. Following the irregular course of the summit of the Continental divide, it is, in round numbers, about two hundred and twenty miles. From the southeast corner of the county to Long's peak, following the course of the range, is about a hundred miles. From the southeast corner to Richthofen peak the Continental divide is necessarily the range intended, as no other range exists. After following this summit, in all its various winding, for a distance of over a hundred miles, by what authority are we to leave it and follow the summit of Medicine Bow spur, in the absence of any direction in the act to that end? The eastern boundary in this section is designated as the summit of the Snowy range. But one range was intended. · The Continental divide answers the call for the entire distance. There is no requirement of a course northerly, as in the section establishing the county of Larimer. It is the *only* range which answers the call for the entire distance. If we attempt to trace the boundary from the north to the south, it is the only monument to be found upon the northern boundary answering the call. If we say that the Medicine Bow spur was intended, a party of surveyors must be detailed to fix an artificial monument upon the northern boundary, from which to run an air line southward to the summit of · Medicine Bow spur. Every rule of construction, therefore, requires us to say that the legislature, in describing the eastern boundary of the county of Summit as the summit of the Snowy range, intended the Continental divide. It is unreasonable to suppose that the legislature did not intend to make this eastern boundary conform to the western boundary of Larimer county. If this be conceded, the term "snowy range" must be taken to mean the same boundary in both sections.

It being clear what range was intended in fixing the eastern boundary of Summit county, it becomes equally clear, by reference, what range was meant in fixing the western boundary of Larimer. *Certum est quod certum reddi potest* is both a rule of law and of logic. And here I wish to repeat that if the legislature had already fixed the western boundary of the county of Larimer in part upon the Medicine Bow spur, it is remarkable that they did not make the eastern boundary of Summit county conform to it by mention of the spur, as in the case of Lake county, when not to do so was to leave the North Park outside of any organized county.

Let us now turn our attention to a construction of the section establishing the boundary of the county of Larimer. As we have seen, it establishes the southwest corner of the county upon the summit of the Snowy range, coincident with the northwest corner of Boulder county, " at or near the summit of Long's peak." Without dispute, at this point the range is the Continental divide. By the language of the section its boundary is: "Thence, in a northerly direction, on said summit, to the northern boundary of the territory." We follow it for eighteen miles, to Richthofen peak, where it throws off the Medicine Bow spur. The legislature having given us a starting point upon the Continental divide, and directed us to proceed "northerly" "on said summit," again it may be asked, by what authority, after following it for eighteen miles, are we to leave it?

The direction is not "northerly" alone, but "northerly" "on said summit." True, we lose the course "northerly" for a distance of about forty-five miles, but monuments control courses, and, if the average course be taken from the point of beginning to the point of ending, the course is "northerly." The Medicine Bow range undoubtedly satisfies the course northerly indicated more fully than the main range, but it does not satisfy, to the same extent, the designation "snowy range," nor does it

satisfy at all the course indicated by the words "on said summit." For a distance of twenty-five miles or more from the point of departure (according to the testimony) it is a bold, well-defined range, with more or less snow upon its summits. But long before it reaches the northern boundary of the state it drops off into secondary mountains and foot-hills, and finally subsides into plains. As a boundary line, it offers the summit called for by the section only for a part of the distance; for the remaining distance resort must be had to an air line and to an artificial monument upon the northern boundary. Construing the section by itself, there is no authority for saying that the western boundary of Larimer county is to be found on the summit of any other range than the one thus clearly and specifically indicated and determined by the starting point fixed at its southwest corner, "at or near the summit of Long's peak."

Monuments control courses, and a specific course will control a general course. By the words, "thence in a northerly direction on said summit," the legislature intended a continuous line following the course of the summit of the range upon which they had established the starting point. "Thence in a northerly direction" is a general call for course. "Thence in a northerly direction on said summit" is a call for a specific course. Monument and course are, in this case, associated and identical at every step of the way, and while the general course is northerly, the specific course is "northerly on said summit." Possibly the legislature may have intended the Medicine Bow range, as it fronts the plains from its point of departure. Possibly they may have thought it the Continental divide. But all this rests in conjecture, and not upon the terms of the act.

Much has been said in this discussion respecting the maps published, from time to time, showing the western boundary line of Larimer county to be the Medicine Bow range. None of these maps appear to have been pub-

lished by authority. They appear to be the work of private individuals, and are valuable only as showing their construction of the act fixing the boundaries of the different counties of the state. We do not notice them further, as none of them are in evidence. The Hayden maps and surveys were published by authority of congress. We have noticed them judicially in several instances. While it is true that it appears from the testimony that the Medicine Bow range has been recognized as the western boundary of the county of Larimer in one or two instances by the executive of the state, and, in other instances, by the county officials of Grand county, it is our duty to construe the act for ourselves, and, if its terms be reasonably plain, a different construction given it by officials cannot be allowed either place or weight. Much stress is laid upon the fact that, for a long period of time, Larimer county laid no claim to the territory in dispute. But, in this connection, it must be remembered that the North Park is geographically isolated, and, for a long time after the passage of the act organizing the counties of the territory, was uninhabited. According to the testimony, it was a hunting ground for the Indians, to which it was dangerous for the white man to resort. Whether it was in this or that county was a neglected question, which no one was especially interested in raising. Occupancy and settlement brought it into notice, and gave it some civil and political importance. The contention for its municipal control followed close in the footsteps of the first settlers. We find nothing in this point justifying a different conclusion from the one stated.

The judgment of the court below is affirmed.

*Affirmed.*